UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------x
THOMAS WOODING,

                     Plaintiff,

     -against-

WINTHROP UNIVERSITY HOSPITAL,
HERBERT PERRY *in his individual and official*
*capacity,* SCOTT GORENSTEIN *in his individual*
*and official capacity,* CHARLES OCCHIPINTI *in*
*his individual and official capacity,* FRANCESCA
BIENIEK *in her individual and official capacity,*
DONNA HANGAN *in her individual and official*
*capacity,*

                    Defendants.

----------------------------------------------------------------x

**MEMORANDUM OF
DECISION AND ORDER**
16-cv-4477 (ADS)(ARL)

**APPEARANCES:**
**Law Offices of Frederick K. Brewington**
*Attorneys for the Plaintiff*
556 Peninsula Boulevard
Hempstead, NY 11550
       By:    Frederick K. Brewington, Esq.,
               Cathryn Harris-Marchesi, Esq.,
               Olivier E. Roche, Esq., Of Counsel

**Putney, Twombly, Hall & Hirson LLP**
*Attorneys for the Defendants*
521 Fifth Avenue
New York, NY 10175
       By:    Mary Ellen Donnelly, Esq.,
               Robert M. Tucker, Esq., Of Counsel

**SPATT, District Judge**:

      The Plaintiff Thomas Wooding (the "Plaintiff") commenced this employment

discrimination action against the Defendants Winthrop University Hospital ("Winthrop"), Herbert

Perry ("Perry"), Scott Gorenstein ("Gorenstein"), Charles Occhipinti ("Occhipinti"), Francesca

Bieniek ("Bieniek"), and Donna Hangan ("Hangan") (collectively, the "Defendants"), alleging

various violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* ("Title

1

VII"), the New York State Human Rights Law, N.Y. Exec. Law § 296 (the "NYSHRL"), 41 U.S.C. §1981 ("Section 1981"), and the New York Labor Law ("NYLL").

Presently before the Court is a motion by the Defendants to dismiss the complaint pursuant to Federal Rule of Civil Procedure ("FED. R. CIV. P." or "Rule") 12(b)(6). For the following reasons, the Defendants' motion is granted in part and denied in part.

# I. BACKGROUND

## A. Factual Allegations of the Complaint

The Plaintiff, an African American male, worked as a physician's assistant for Winthrop from November 2013 until March 21, 2016. He held the title of Chief Physician's Assistant for most of his tenure.

The Plaintiffs immediate supervisors were Perry, a white male; Gorenstein, a white male; Occhipinti, a white male; and Bieniek, a white female. Hangan who is a white female, worked at Winthrop.

The Plaintiff was the only African American in his department, and was the only African American physician's assistant at the hospital. One of the Plaintiff's co-workers, Patricia Rooney, told the Plaintiff that his superiors referred to him as a "nigger" in her presence. The Plaintiff avers that ten to fifteen people "were witness to these actions," though it is not clear from the face of the complaint whether "these actions" refer to the use of the racial slur, or to the general allegations made by the Plaintiff.

The complaint alleges that in January 2014, Perry "began to verbally attack [the] Plaintiff." (Complaint at ¶ 21). The complaint does not state how Perry verbally attacked him, or what the basis of the attack was. The Plaintiff informed his superiors throughout 2014 and 2015 about "the discriminatory and retaliatory treatment [the] Plaintiff was subjected to." (*Id.* at ¶ 21).

The complaint also alleges, without providing supporting facts, that Gorenstein treated the Plaintiff differently because of his race and color. The Plaintiff notified his superiors numerous times about this alleged differential treatment.

The Plaintiff does not cite to specific individuals or situations, but states that white employees failed to have charts on hand during treatment; yelled in front of patients; failed to properly assess patients before treatment; and failed to obtain consent forms, but were not subjected to the same discipline as the Plaintiff.

On April 10, 2014, Hangan was hired to work at Winthrop. The Plaintiff alleges that "Hangan and Gorenstein are close personal friends." (*Id.* at ¶ 24). The Plaintiff further claims that Hangan began throwing out the Plaintiff's medical documentation the day that Hangan was hired. The Plaintiff's co-workers purportedly told the Plaintiff that Hangan was "gunning for him." (*Id.* at ¶ 25). When the Plaintiff complained about Hangan's hiring and conduct to Occhipinti, Occhipinti referred the Plainitiff to Gorenstein.

In April 2014, Perry instructed the Plaintiff's Hyperbaric assistants to refrain from performing safety checks or instructing patients on a treatment's risks and benefits. About this time, Perry began "mistreating" the Plaintiff. Again, the complaint does not specify how the Plaintiff was mistreated, but the Plaintiff states that in response to the mistreatment, he arrived early to work to complete any work that would be seen by Perry. However, Perry was apparently not satisfied with the Plaintiff's work, and ripped up the Plaintiff's medical documentation in front of the Plaintiff, his co-workers, and his patients. Perry refused to accept the Plaintiff's charts, but accepted charts from white employees.

On April 25, 2014, Perry told the Plaintiff that if he did not perform shorter patient consults he would not be working at the hospital much longer. The Plaintiff claims that Perry gave him

conflicting instructions on the amount of time he needed to spend on consults, and that Perry would reprimand him when he followed the conflicting instructions. Despite Perry's attitude towards the Plaintiff, he received praise from other doctors for his consults during this time.

On May 28, 2014, the Plaintiff asked Bienek to have Perry only speak with him about patient care. Despite the request, the Plaintiff states that Perry's conduct towards him did not change.

On June 5, 2014, Perry allegedly belittled the Plaintiff in front of co-workers while Perry was improperly filling out medical paperwork. The substance of the disparagement is not stated in the complaint, but the Plaintiff claims that Perry also objected to the Plaintiff countersigning Perry's medical charts.

On June 23, 2014, the Plaintiff told Bienek that Perry screamed profanities at him in front of patients.

On June 25, 2014, Perry substituted another doctor's treatment with his own. The Plaintiff contends that this resulted in an increased risk to patients, so the Plaintiff informed the supervising attending.

On July 14, 2014, the Plaintiff allegedly learned that Perry was fraudulently billing patients without seeing them. When the Plaintiff informed Gorenstein of this, he told the Plaintiff to refuse Perry's medical charts. The Plaintiff states that this request put him in an uncomfortable position— having to refuse the requests of a superior; and that no white employees were placed in such a position.

On August 5, 2014, Occhipinti disciplined the Plaintiff for being late. The Plaintiff was scheduled to start at 2:00p.m., and arrived at 2:04 p.m., which meant that he arrived one minute after the tardy grace period expired. The Plaintiff states that it was the only instance during his

more than two-year tenure when he was late. The Plaintiff further contends—without offering names, credentials, or specific instances—that similarly situated white employees were not disciplined when they were late. The Plaintiff states that Jose Ballicongan missed an entire shift during his tenure at Winthrop, but was not disciplined. It is not clear from the face of the complaint whether Ballicongan worked as a physician's assistant, or whether he was a member of the Plaintiff's protected class.

On August 7, 2014, the Plaintiff completed a quality assurance project, which was among his duties as Chief Physician's Assistant of the Hyperbarics Department. He noted a number of deficiencies in Hangan's work, and claims that the deficiencies were so severe that the Plaintiff was concerned for patients' well-being. Despite the Plaintiff's findings, Hangan was exempted from any discipline through Winthrop's "Just Culture Policy," which permits employees to make mistakes.

On August 8, 2014, Perry gave the Plaintiff advice that contradicted the attending doctor's orders. When the Plaintiff questioned Perry's advice, Perry belittled him in front of other staff.

About this time, the Plaintiff states that Gorenstein changed his policy regarding new consults. Previously, doctors had been present for the first hour of a new consult. In the summer of 2014, Gorenstein told physician's assistants that they would be solely responsible for initial consults.

As a result of this change, the Plaintiff canceled a certain treatment for a patient because he believed that there was a serious risk. Under the previous policy, a doctor would have had to evaluate the course of care before any change was approved. The Plaintiff and several medical technicians from the hyperbarics department attempted to contact Gorenstein to consult with him, but he could not be reached.

Hangan reported the Plaintiff's actions to Occhipinti, who "validated" the incident as a disciplinary matter. The complaint does not clarify what validate means in this context, or what type of disciplinary action was taken. The Plaintiff maintains that he based his decisions on Gorenstein's directions.

Hangan purportedly used other avenues to frustrate the Plaintiff's employment, including berating and harassing him; refusing to assist him; lying to him; refusing to care for patients during her shift; and challenging his authority.

On October 22, 2014, Perry told the Plaintiff to complete medical documents that Perry had already signed. The Plaintiff states that fulfilling Perry's request would have been illegal, because medical documents are supposed to be signed after they are completed. The Plaintiff objected to Perry's request, and emailed his superiors. As a result of the incident, the Plaintiff claims he was "isolated"; informed that he was overly condescending; and asked to not inject personal opinions. The Plaintiff alleges that Occhipinti, Gorenstein, and Bieniek all told him that he was being disrespectful and overbearing.

On November 14, 2014, the Plaintiff met with Bieniek, who told him that he was being disciplined for several reasons: he was not completing his workload or administrative tasks; he was not following procedure or protocol; he wrote excessively long and condescending emails; and he was suspected of having an improper parking arrangement in the visitors' parking lot. The Plaintiff contends that many of these allegations were manufactured, and that he had in fact followed orders of his superiors in the instances detailed by Bieniek.

On December 12, 2014, the Plaintiff was training a new physician's assistant named Eliot. While the Plaintiff was training Eliot, Perry "berated [the] Plaintiff about writing an email." (Complaint at ¶ 47). Perry paced behind the Plaintiff while the Plaintiff cared for a patient, and

said, "I want to know what it was all about. Do you hear me?" (*Id.*) After the Plaintiff showed Perry the email, Perry said, "That's all you had to do in the first place motherfucker. I'm tired of your bullshit. You are skating on thin ice. I want you fired and want you off the premises." (*Id.*). Other individuals allegedly removed Perry so that the Plaintiff could treat his patient, and Eliot encouraged the Plaintiff to document what happened.

On December 19, 2014, Perry accused the Plaintiff of taking unsanctioned personal breaks, and told him that he was going to inform the Plaintiff's supervisor.

On March 13, 2015, Perry screamed at the Plaintiff in front of patients and other staff. Perry ripped up the Plaintiff's medical documents and "superbills," and told the Plaintiff to "get the hell away from [him]." (*Id.* at ¶ 50). When the Plaintiff refused Perry's charts per Gorenstein's instructions, Perry yelled, "Do what I say! Do you hear me? Do as I say!" (*Id.*).

Three days later, on March 16, 2015, the Plaintiff claims that "a patient refused medical attention because of the way [] Perry had treated [the] Plaintiff on March 13, 2015." (*Id.* at ¶ 51). The same day, Perry purportedly filled out medical forms with false information. The Plaintiff informed his superiors of Perry's conduct on March 13, 2015, and March 16, 2015.

On May 26, 2015, Bieniek allegedly reprimanded the Plaintiff for taking a bathroom break. The Plaintiff states that he was entitled to take a bathroom break, and that he followed the previous instructions of Gorenstein and Bieniek as to breaks.

On June 4, 2015, the Plaintiff was suspended with pay for allegedly scheduling an ear, nose and throat ("ENT") consultation for a patient. Gorenstein had instructed physician's assistants the previous week to stop scheduling ENT consultations. The Plaintiff details the various reasons that he believes he was correct in scheduling the consult. Nevertheless, the Plaintiff was disciplined, and did not receive the benefit of the Just Culture Policy.

On June 17, 2015, the Plaintiff filed a complaint with the New York State Division of Human Rights ("NYSDHR"), alleging racial discrimination and retaliation.

The Plaintiff returned to work some time before July 7, 2015, and he states that he was cleared of any wrongdoing. Despite that, the Plaintiff was stripped of his title of Chief Physician's Assistant, and told that the change would be retroactive. That is, Winthrop told the Plaintiff that he could not represent to other individuals or employers that he had ever held the title of Chief Physician's Assistant at Winthrop.

On July 7, 2015, the Plaintiff was placed on a one-month assessment, and Gorenstein was assigned to assess him. Gorenstein purportedly told the Plaintiff to not respond to emails that concerned patient care, which the Plaintiff claims would have been against hospital policy. Gorenstein told the Plaintiff that he was deficient in his duties.

The Plaintiff asked his superiors at Winthrop if he would receive a fair assessment from Gorenstein, since the Plaintiff had made previous complaints about him. The Plaintiff said that his "emails were met with abuse and disdain." (*Id.* at ¶ 62).

On or about September 3, 2015, Gorenstein allegedly told the Plaintiff not to discuss anything with him by email. However, Gorenstein would email the Plaintiff. Gorenstein chastised the Plaintiff for using the "M.D. service line," despite apparently instructing the Plaintiff to use it. The Plaintiff states that Gorenstein castigated the Plaintiff for numerous "trivial issues" like the sign out sheet, when Gorenstein did not address those issues with white employees who failed to perform the same duties. Gorenstein also told the Plaintiff to not make any independent decisions about patient care, and penalized the Plaintiff for doing so.

Similarly, the Division Chief of Surgery, Dr. Brem, also told the Plaintiff not to respond to any emails from any Winthrop employees. The Plaintiff states that when the Chair of the

Department of Surgery learned that the Plaintiff was being prevented from answering emails, he was "shocked, as it severely and significantly diminished [the] Plaintiff's capacity to conduct his duties as a [physician's assistant]." (*Id.* at ¶ 65).

On September 3, 2015, the Plaintiff told Gorenstein that he was "alarmed" that the Plaintiff was being subjected to racial discrimination. The Plaintiff further stated that he believed the problems began when Hangan was hired. The Plaintiff emailed Gorenstein for a meeting to discuss the issues, but the email went unanswered.

That same day, the Plainitff also told Winthrop's Human Resources Manager, Roseann Caldon ("Caldon"), that he believed he was the subject of racial discrimination and retaliation.

On September 5, 2015, the Plaintiff expressed his belief to Gorenstein that he was being "singled out" for his perceived problems with medical documentation and patient care; and that white employees were not treated as he was. Later that day, Gorenstein told the Plaintiff to stop including "Have a Blessed Evening" in the subject lines of his emails. The Plaintiff claims that white physician's assistants were permitted to keep similar subject lines. The Plaintiff emailed Caldon again about Gorenstein's behavior.

On September 23, 2015, Bieniek informed the Plaintiff that he would be rotating through the wound-care center, under the supervision of Gorenstein. The Plaintiff states that this was contrary to instructions given by Dr. Brem, the Division Chief of Surgery.

On September 24, 2015, the Plaintiff was told to provide his medical dictations, which were reviewed by the Chief Medical Officer of the hospital. Medical "[d]ictations are documentation of personnel's interactions with a patient and details of their treatment." (*Id.* at ¶ 71).

On October 1, 2015, the Plaintiff emailed Caldon again to complain about his wound-care rotation, and being placed under Gorenstein's supervision. The Plaintiff further postulated that Gorenstein was not following hospital protocol. The complaint is not clear what protocols the Plaintiff believed Gorenstein failed to follow, but it implies that the requests for dictation may have violated protocols. The Plaintiff asked Caldon to intervene to keep him on the hyperbarics unit, and pointed out that Hangan had not yet rotated through wound-care.

On October 26, 2015, Bieniek sent an email to the Plaintiff accusing him of mistreating a patient. The Plaintiff states that "at this time, [he] had no interaction with the patient he was being accused of incorrectly treating." (*Id.* at ¶ 75).

On November 19, 2015, the Plaintiff emailed the Defendants to express his concern that he was being subjected to discrimination and retaliation. He further noted that he had been assigned to the wound care center for four out of five months, which contradicted his superiors' statements that all physician's assistants would rotate through the divisions equally. Specifically, the Plaintiff said that Hangan had refused to rotate through wound care, and had been accommodated. Furthermore, the Plaintiff expressed wonder at being reprimanded for using his cellular phone on his breaks, because that was "in contradiction to previous statements listed in emails in his possession . . . ." (*Id.* at ¶ 77). All of the Plaintiff's emails regarding his treatment were "ignored." (*Id.*).

On January 5, 2016, the NYSDHR issued a finding of no probable cause in the Plaintiff's complaint. The Plaintiff requested an EEOC review of the finding, and the EEOC gave the Plaintiff a right to sue letter on May 26, 2016.

On March 21, 2016, Winthrop terminated the Plaintiff, claiming that he violated HIPAA by disclosing patient information. The Plaintiff said that if he disclosed any information, it was in the pursuit of his NYSDHR claims.

## B. Relevant Procedural History

On August 10, 2016, the Plaintiff filed his complaint. He listed ten counts. The Plaintiff alleged that each of the Defendants engaged in discrimination and retaliation, and subjected him to a hostile work environment, in violation of Section 1981, Title VII, the NYSHRL, and the NCHRL. The Plaintiff also brought claims for retaliation under the NYLL and common law negligent infliction of emotional distress against all of the Defendants.

On November 8, 2016, the Defendants filed the instant motion to dismiss the complaint pursuant to Rule 12(b)(6). The Defendants attached five exhibits to their motion: the instant complaint; the Plaintiff's first NYSDHR complaint; the NYSDHR determination and order after investigation of the Plaintiff's first complaint; the Plaintiff's second NYSDHR complaint; and the NYSDHR determination and order of dismissal of the Plaintiff's second complaint.

In his memorandum in opposition, the Plaintiff conceded that there is no individual liability under Title VII or NYLL § 741, and further withdrew his NIED and NCHRL claims.

Therefore, the claims left for the Court to consider are as follows: discrimination, retaliation, and hostile work environment under Section 1981, and the NYSHRL against all Defendants; discrimination, retaliation, and hostile work environment under Title VII against Winthrop; and retaliation under NYLL §§ 740 and 741 against Winthrop.

## II. DISCUSSION

### A. The Standard of Review

In reviewing a motion to dismiss pursuant to Rule 12(b)(6), the Court must accept the factual allegations set forth in the complaint as true and draw all reasonable inferences in favor of the Plaintiff. *See Walker v. Schult*, 717 F.3d 119, 124 (2d Cir. 2013); *Cleveland v. Caplaw Enters.*, 448 F.3d 518, 521 (2d Cir. 2006); *Bold Electric, Inc. v. City of New York*, 53 F.3d 465, 469 (2d Cir. 1995); *Reed v. Garden City Union Free School Dist.*, 987 F. Supp. 2d 260, 263 (E.D.N.Y. 2013).

Under the now well-established *Twombly* standard, a complaint should be dismissed only if it does not contain enough allegations of fact to state a claim for relief that is "plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 1974, 167 L. Ed. 2d 929 (2007). The Second Circuit has explained that, after *Twombly,* the Court's inquiry under Rule 12(b)(6) is guided by two principles:

> First, although a court must accept as true all of the allegations contained in a complaint, that tenet is inapplicable to legal conclusions, and [t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. Second, only a complaint that states a plausible claim for relief survives a motion to dismiss and [d]etermining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.

*Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 664, 129 S. Ct. 1937, 1940, 173 L. Ed. 2d 868 (2009)).

Thus, "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and . . . determine whether they plausibly give rise to an entitlement of relief." *Iqbal*, 556 U.S. at 679.

**B. As to the Exhibits Attached to the Defendants' Motion to Dismiss**

The Plaintiff asks the Court to disregard the Defendants' exhibits annexed to their motion because they were not included in the Plaintiff's complaint. However, the Court will take the exhibits into consideration because the Plaintiff clearly relied on the NYSDHR complaints and determinations, and the Court is permitted to take judicial notice of state administrative documents.

"When determining the sufficiency of plaintiff['s] claim for Rule 12(b)(6) purposes, consideration is limited to the factual allegations in [the] complaint, documents attached to the complaint as an exhibit or incorporated in it by reference, matters of which judicial notice may be taken, or documents either in plaintiff['s] possession or of which plaintiff[ ] had knowledge and relied in bringing suit." *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993). Therefore, when a plaintiff chooses not to attach to the complaint or incorporate by reference a document upon which it solely relies and which is integral to the complaint, the court may nevertheless take that document into consideration in deciding a defendant's motion to dismiss, without converting the motion into one for summary judgment. *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47–48 (2d Cir. 1991).

However, when a party submits additional evidence to the Court in connection with a motion to dismiss, beyond the scope of those allowed under *Brass* and *Cortec*, "a district court must either 'exclude the additional material and decide the motion on the complaint alone' or 'convert the motion to one for summary judgment under Fed. R .Civ. P. 56 and afford all parties the opportunity to present supporting material.'" *Friedl v. City of New York*, 210 F.3d 79, 83 (2d Cir. 2000) (quoting *Fonte v. Bd. of Managers of Cont'l Towers Condo.*, 848 F.2d 24, 25 (2d Cir. 1988)); *see also* Fed. R. Civ. P. 12(b); 5C Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1366.

Here, the complaint references the Plaintiff's NYSDHR filings, as well as the division's findings, but did not incorporate or attach those documents. The NYSDHR complaints were written by the Plaintiff and form the basis of his current suit. Furthermore, the Court "may take judicial notice of the records of state administrative procedures, as these are public records, without converting a motion to dismiss to one for summary judgment." *Evans v. New York Botanical Garden,* No. 02 Civ. 3591, 2002 WL 31002814, at *4 (S.D.N.Y. Sept.4, 2002) (citations omitted); *see also Daniel v. Long Island Hous. P'ship, Inc.*, No. 08-CV-01455 JFB/WDW, 2009 WL 702209, at *5 n.4 (E.D.N.Y. Mar. 13, 2009) ("The Court may consider the EEOC charges because they are public documents filed in state administrative proceedings, as well as because they are integral to her Title VII claim.") (citations omitted); *Johnson v. Cty. of Nassau*, 411 F. Supp. 2d 171, 178 (E.D.N.Y. 2006) (taking notice of the NYSDHR complaint, determination, and investigatory file because they were integral to his complaint, and because the Court could take judicial notice of state administrative proceedings); *Dutton v. Swissport USA, Inc.,* No. 04 CV 3417, 2005 WL 1593969, at * 1 (E.D.N.Y. July 1, 2005) (taking judicial notice of transcript from Worker's Compensation Board hearing and plaintiff's NYSDHR complaint); *Brodeur v. City of New York,* No. 04 Civ. 1859(JG), 2005 U.S. Dist. LEXIS 10865, at *9, 2005 WL 1139908 (E.D.N.Y. May 13, 2005) (stating that the court could consider "public documents of which the plaintiff has notice" on a Rule 12(b)(6) motion to dismiss); *Thomas v. Westchester County Health Care Corp.,* 232 F. Supp. 2d 273, 276 (S.D.N.Y. 2002) (taking judicial notice of transcript from disciplinary hearing brought pursuant to section 75 of the New York State Civil Service Law and a report of the Impartial Hearing Officer that resulted from the hearing).

Therefore, the Court will consider the Defendants' exhibits without converting the motion into one for summary judgment.

**C. Threshold Issue: As to Whether the Plaintiff Waived his Racial Discrimination, Retaliation, and Hostile Work Environment Claims by Bringing Claims Under NYLL §§ 740 and 741**

The Defendants state that the Plaintiff has waived his causes of action that stem from the alleged racial discrimination by bringing claims relating to his alleged whistleblowing. Although it is one of the Defendants' last points in their initial memorandum of law, the Court must address it before deciding whether the Plaintiff has sufficiently plead his Title VII, Section 1981 and NYSHRL causes of action. If the Court were to find that the Plaintiff indeed waived those claims, then the Court would not need to decide whether there were sufficient facts to withstand a motion to dismiss. The Court finds that the Plaintiff has not waived those claims.

Section 740 of the NYLL states that "the institution of an action in accordance with this section shall be deemed a waiver of the rights and remedies available under any other contract, collective bargaining agreement, law, rule or regulation or under the common law." N.Y. Lab. Law § 740(7). However, the first clause of that same sentence reads that "[n]othing in this section shall be deemed to diminish the rights, privileges, or remedies of any employee under any other law or regulation or under any collective bargaining agreement or employment contract . . . ." *Id.* As the Second Circuit has said, "[t]he two clauses of section 740(7) would seem potentially to contradict each other." *Reddington v. Staten Island Univ. Hosp.*, 511 F.3d 126, 134 (2d Cir. 2007), *certified question accepted,* 9 N.Y.3d 1020, 881 N.E.2d 214 (N.Y. 2008), and *certified question answered,* 11 N.Y.3d 80, 893 N.E.2d 120 (N.Y. 2008). "On a plain reading of Clause Two, New York's whistleblower regime not only diminishes other rights, but for employees who seek its shelter, it eviscerates them." *Collette v. St. Luke's Roosevelt Hosp.,* 132 F. Supp. 2d 256, 262–63 (S.D.N.Y. 2001) (internal alterations omitted).

The Second Circuit summarized the treatment of the statute by state and federal courts:

Responding to this apparent incongruity, courts have adopted differing and sometimes contradictory limiting constructions of this waiver. New York state courts have generally held that the waiver applies to all causes of action that relate to the retaliatory discharge, which may include contract claims, and claims arising under state antidiscrimination laws. Federal district courts, in contrast, generally interpret the waiver as applying only to rights and remedies concerning whistleblowing, and therefore deem it not to apply, for example, to claims of employment discrimination. Additionally, federal courts have interpreted the provision not to waive or otherwise affect rights arising under federal law.

*Reddington*, 511 F.3d at 134 (collecting cases) (internal citations and quotation marks omitted).

The Defendants seek a severe remedy. Under the Defendants' interpretation of the law, a person who faced discrimination because of their gender or race, but who also exposed malfeasance in the workplace and was fired because of it, would have to choose which form of discrimination to pursue in Court.

This Court agrees with the reasoning and conclusions of several federal courts, including the court in *Collette*, which held that the "waiver provision applies only to rights and remedies concerning whistleblowing as defined in the Act. This standard effectuates the Act's remedial purpose by permitting employees to pursue legitimately independent claims, while prohibiting claims that duplicate or overlap the statutory remedies for retaliation on account of whistleblowing activity alone." 132 F. Supp. 2d at 274; *see also Humphrey v. Rav Investigative & Sec. Servs. Ltd.*, 169 F. Supp. 3d 489, 501 (S.D.N.Y. 2016) ("However, the majority of district courts in this Circuit, citing the constitutional concerns raised by a construction that requires the automatic waiver of a plaintiff's federal rights, *cf.* U.S. CONST. art. VI, cl. 2, have construed the provision as not barring claims under federal law." (collecting cases)); *Magnotti v. Crossroads Healthcare Mgmt., LLC*, 126 F. Supp. 3d 301, 315 (E.D.N.Y. 2015) ("Certain state courts have broadly interpreted the waiver clause to require dismissal of any causes of action arising out of the same conduct that underpinned the Section 740 claim, but many federal courts, including this Court, have harmonized

it with the broad protective language that precedes it, construing it to waive only other legal rights and remedies that protect against the same wrong that the whistleblower complains of." (internal citations omitted)).

Accordingly, the Court finds that the Plaintiff did not waive his rights and remedies under Title VII, Section 1981, or the NYSHRL by instituting causes of action under NYLL Sections 740 and 741. Having determined that the Plaintiff has not waived his rights and remedies under those statutes, the Court will now consider whether the Plaintiff has sufficiently plead those causes of action.

## D. The *McDonnell Douglas* Burden Shifting Framework

To evaluate claims of discrimination and retaliation under Title VII, Section 1981, and the NYSHRL, courts must apply the *McDonnell Douglas* burden shifting framework. *McGill v. Univ. of Rochester*, 600 F. App'x 789, 790 (2d Cir. 2015) ("We analyze Title VII, Section 1981, and NYSHRL discrimination claims under the same burden shifting framework as first set forth by the Supreme Court in *McDonnell Douglas*.")

The burden shifting framework, laid out by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), has four steps. The Plaintiff has the initial burden of proving a *prima facie* case of discrimination. *Id.* at 802. If the Plaintiff establishes a *prima facie* case, the burden shifts to the Defendant to articulate a legitimate, non-discriminatory reason for his termination. *Id.* If the Defendant succeeds in meeting its burden, the presumption of animus "drops out of the picture." *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 510–11, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993). The Plaintiff must then show that the Defendant's actions were the result of impermissible discrimination. *Holcomb v. Iona College,* 521 F.3d 130,138 (2d Cir. 2008). "The plaintiff need not prove that the explanation offered by the

employer was entirely false 'but only that ... [the defendant's] stated reason was not the only reason' and that consideration of an impermissible factor 'did make a difference.'" *Phillips v. Dow Jones & Co.,* No. 04 Civ. 5178, 2009 WL 2568437, at *9 (S.D.N.Y. Aug. 17, 2009) (*quoting Montana v. First Fed. Sav. & Loan Ass'n of Rochester,* 869 F.2d 100, 105 (2d Cir. 1989)).

At the pleadings stage, a plaintiff does not need to prove discrimination, or even allege facts establishing every element of a *prima facie* case, but the facts alleged must give "plausible support to the reduced requirements" of the *prima facie* case. *Littlejohn v. City of New York,* 795 F.3d 297, 311 (2d Cir. 2015); *Dawson v. N.Y.C. Transit Auth.,* 624 F. App'x. 763, 765–67 (2d Cir. 2015) (summary order); *Williams v. N.Y.C. Hous. Auth.,* 458 F.3d 67, 71 (2d Cir. 2006). Specifically,

> absent direct evidence of discrimination, what must be plausibly supported by facts alleged in the complaint is that the plaintiff is a member of a protected class, was qualified, suffered an adverse employment action, and has at least minimal support for the proposition that the employer was motivated by discriminatory intent. The facts alleged must give plausible support to the reduced requirements that arise under *McDonnell Douglas* in the initial phase of a Title VII litigation. The facts required by *Iqbal* to be alleged in the complaint need not give plausible support to the ultimate question of whether the adverse employment action was attributable to discrimination. They need only give plausible support to a minimal inference of discriminatory motivation.

*Littlejohn,* 795 F.3d at 311.

### E. As to the Plaintiff's Discrimination Claims Against Winthrop

The Defendants argue that the Plaintiff's discrimination claims against Winthrop must be dismissed because the Plaintiff has failed to allege that his race or color were motivating factors in any adverse employment action; or that the Defendants acted with discriminatory intent. They contend that the Plaintiff has failed to present similarly situated individuals outside of the Plaintiff's protected class were treated differently; and that the Plaintiff's allegation that his superiors referred to him as a "nigger" is based on inadmissible hearsay. In opposition, the Plaintiff

maintains that he has provided sufficient allegations to survive the Defendants' motion by offering Hangan and Ballincongan as two individuals outside the Plaintiff's protected class who were treated differently, and that there was evidence of discriminatory intent through the use of the word "nigger." The Plaintiff further argues that merely referring generally to other physician's assistants is sufficient. The Court finds that the Plaintiff has met his burden.

To establish a *prima facie* case of discrimination under Title VII, Section 1981, or the NYSHRL, a Plaintiff must show that "(1)[the] plaintiff is a member of a protected class; (2) [the] plaintiff was qualified for [] [] h[is] position; (3) plaintiff was subjected to an adverse employment action; and (4) the adverse employment action took place under circumstances giving a rise to an inference of discrimination based on plaintiff's membership in the protected class." *El–Din v. N.Y.C. Admin. for Children's Servs.,* No. 12 Civ. 1133(PAE), 2012 WL 3839344, at *4 (S.D.N.Y. Sept. 5, 2012) (citing *Gorzynski v. JetBlue Airways Corp.,* 596 F.3d 93, 107 (2d Cir. 2010)); *see also Cortes v. City of N.Y.*, 700 F. Supp. 2d 474, 488 (S.D.N.Y. 2010) ("Employment discrimination claims brought under Title VII and § 1981 are subject to the same analysis.").

The Defendants, by their silence, do not dispute that the Plaintiff has sufficiently plead the first three elements.

As to the final element,

> [a]n inference of discrimination can arise from circumstances including, but not limited to, "the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's discharge."

*Littlejohn*, 795 F.3d at 312 (quoting *Leibowitz v. Cornell Univ.,* 584 F.3d 487, 502 (2d Cir. 2009)). If the Plaintiff seeks to compare himself to other comparable employees, they "must be similarly situated in all material respects—not in all respects." *McGuinness v. Lincoln Hall*, 263 F.3d 49,

53 (2d Cir. 2001) (quoting *Shumway v. United Parcel Serv., Inc.*, 118 F.3d 60, 64 (2d Cir. 1997) (internal quotation marks and emphasis omitted).

In the Court's view, the Plaintiff has not met his burden of offering similarly situated employees outside of his protected class.

While at this stage the Plaintiff does not have to prove that the comparators were similarly situated in all material aspects, he must allege facts that plausibly support a finding that they were similarly situated. *See Weslowski v. Zugibe,* 14 F. Supp. 3d 295, 319 (S.D.N.Y. 2014) ("Although, at the motion to dismiss stage, evidence of similarly situated comparators is not necessary, a court still must determine whether, based on a plaintiff's allegations in the complaint, it is plausible that a jury could ultimately determine that the comparators are similarly situated.") (internal alterations citations and quotation marks omitted); *Mosdos Chofetz Chaim, Inc. v. Vill. of Wesley Hills,* 815 F. Supp. 2d 679, 698 (S.D.N.Y. 2011) ("At the motion to dismiss stage, such evidence is not necessary; however, a court still must determine whether, based on a plaintiff's allegations in the complaint, it is plausible that a jury could ultimately determine that the comparators are similarly situated.").

The complaint does not state what positions Hangan and Ballincongan held; what their responsibilities were; their qualifications; or the quality of their work. The NYSDHR's first determination states that Hangan was a nurse practitioner. As to Ballincongan, the only facts alleged are that Ballincongan was a co-worker, made a misdiagnosis, and missed nearly an entire shift without being disciplined. The Plaintiff held the title of chief physician's assistant for most of his tenure; it is not alleged that either Ballincongan or Hangan held the same title or that they had similar responsibilities. These facts are insufficient. *See Offor v. Mercy Med. Ctr.*, 167 F. Supp. 3d 414, 432 (E.D.N.Y. 2016) (Spatt, J.) ("Importantly, the SAC does not contain allegations

concerning the 'external Moonlighters' positions or titles, nor how many hours they were assigned. Such a bare allegation is far too vague and bereft of specifics to plausibly allege a claim of disparate treatment on the part of the Defendants in assigning moonlighting hours.") (internal citations omitted), *aff'd in part*, *vacated in part*, *remanded*, No. 16-839, 2017 WL 253616 (2d Cir. Jan. 20, 2017); *Mesias v. Cravath, Swaine & Moore LLP,* 106 F. Supp. 3d 431, 437 (S.D.N.Y. 2015) ("The allegation that a non-Haitian employee could 'borrow' vacation days, while Plaintiff could not, also fails to render plausible an inference of discrimination. The Complaint alleges no facts demonstrating that Plaintiff was 'similarly situated' to her non-Haitian colleague."); *Kajoshaj v. City of N.Y.*, No. 11-CV-4780 FB JMA, 2013 WL 249408, at *2 (E.D.N.Y. Jan. 23, 2013) ("However, without specific factual allegations concerning these allegedly similarly situated individuals, such a bare conclusion cannot survive a motion to dismiss."), *aff'd sub nom. Kajoshaj v. N.Y. City Dep't of Educ.*, 543 F. App'x 11 (2d Cir. 2013).

Furthermore, it appears from the face of the complaint that the Plaintiff supervised at least one, if not both of the allegedly similarly situated employees. The Plaintiff stated that he reviewed Hangan's work and found it deficient, and that he had to correct Ballincongan's work. Supervisors are not similarly situated to the workers they supervise. *Sealy v. Hertz Corp.*, 688 F. Supp. 2d 247, 256 (S.D.N.Y. 2009) ("Plaintiff and his manager occupy different levels within the company and are not alleged to have committed the same rule infractions. Thus, there is no basis in the record from which to conclude that they are similarly situated."); *Gupta v. N.Y. City Sch. Const. Auth.*, No. 04–CV–2896, 2007 WL 1976099, at *15 (E.D.N.Y. May 15, 2007), *report and recommendation adopted in part, rejected in part*, No. 04 CV 2896 NGG LB, 2007 WL 1827418 (E.D.N.Y. June 25, 2007), *aff'd*, 305 F. App'x 687 (2d Cir. 2008) (holding that managers on different levels of the company hierarchy were not similarly situated); *Loucar v. Boston Mkt.*

*Corp.*, 294 F. Supp. 2d 472, 480 (S.D.N.Y. 2003) (holding that the plaintiff was not similarly situated to an employee with five more years of management experience and it was not even clear that the plaintiff was a manager); *Ortiz v. Brookstone Co.*, 274 F. Supp. 2d 456, 463 (S.D.N.Y. 2003) (holding that plaintiff, who was a manager in training, was not similarly situated to a manager who was his supervisor).

However, the Plaintiff's allegations regarding the Defendants' alleged invidious comments about the Plaintiff's race and/or color are sufficient to withstand the Plaintiff's motion to dismiss the Title VII discrimination claim against Winthrop. "[N]o single act can more quickly alter the conditions of employment and create an abusive working environment than the use of an unambiguously racial epithet such as 'nigger' by a supervisor in the presence of subordinates." *Ewing v. Coca Cola Bottling Co. of New York, Inc.*, No. 00–cv–7020, 2001 WL 767070, at *7, 2001 U.S. Dist. LEXIS 8849, at *21–*22 (S.D.N.Y. June 25, 2001) (quoting *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 571 (2d Cir. 2000)).

While the Defendants urge the Court to disregard the Plaintiff's allegations that his superiors used the word "nigger" to refer to him because the allegations are hearsay, the Court cannot do that. The Court does not consider whether the Plaintiff's allegations are admissible at this juncture; it instead must accept them as true. *See Walker*, 717 F.3d at 124. While the Defendants are correct that mere allegations based on hearsay alone would not withstand a motion for summary judgment, *Green v. Harris Publications, Inc.*, 331 F. Supp. 2d 180, 192 (S.D.N.Y. 2004) (stating on a motion for summary judgment that "[r]umors are not evidence. Indeed, plaintiff cannot identify the individual who made the statement or when the statement was made. Hence, the 'token nigger' rumor is inadmissible" (citing *Sarno v. Douglas Elliman–Gibbons & Ives, Inc.*, 183 F.3d 155, 160 (2d Cir. 1999))), the same is not true here.

Similarly, the Plaintiff alleges that three of the individual Defendants, in refusing to listen to the Plaintiff's complaints and disciplining him, used code words for racial discrimination in saying that he was "disrespectful" and "overbearing." While these words are typically used in an innocent fashion, "certain facially non-discriminatory terms can invoke racist concepts that are already planted in the public consciousness." *Lloyd v. Holder*, No. 11 CIV. 3154 AT, 2013 WL 6667531, at *9 (S.D.N.Y. Dec. 17, 2013) (collecting cases). "Whether remarks by defendants or [other] employees support an inference of discrimination depends, however, on the context in which they were made and whether, fairly considered, they themselves reveal discrimination or 'tend[ ] to show that the decision-maker was motivated by assumptions or attitudes relating to the protected class.'" *Humphries v. City Univ. of N.Y.*, No. 13 CIV. 2641 PAE, 2013 WL 6196561, at *9 (S.D.N.Y. Nov. 26, 2013) (quoting *Tomassi v. Insignia Fin. Grp.*, 478 F.3d 111, 116 (2d Cir. 2007)). It is plausible that a reasonable juror could find that the individual Defendants were motivated by racial animus when they stated that the Plaintiff was disrespectful and overbearing. It will depend on the context in which the statements were made, which will be revealed in discovery.

Therefore, the Plaintiff has plead sufficient facts for the Court to plausibly find that Winthrop discriminated against the Plaintiff because of his race and/or skin color. Accordingly, the Defendants' motion to dismiss the Plaintiff's discrimination claims against Winthrop under Title VII, Section 1981, and the NYSHRL pursuant to Rule 12(b)(6) is denied.

## E.  As to the Plaintiff's Retaliation Claims Against Winthrop Based on His NYSDHR Complaints

The Defendants argue that the Plaintiff's termination was too distant in time from any of the Plaintiff's complaints for the Plaintiff to establish a *prima facie* case of retaliation. In opposition, the Plaintiff contends that case law has held that five months between a complaint and

a termination is not too long to find a causal relationship, and that the Defendants waited to terminate the Plaintiff until there was an opportune time. The Court agrees with the Plaintiff.

In order to establish a *prima facie* case of retaliation, a plaintiff must establish "(1) [he] engaged in protected activity; (2) the employer was aware of this activity; (3) the employee suffered a materially adverse employment action; and (4) there was a causal connection between the alleged adverse action and the protected activity." *Kelly v. Howard I. Shapiro & Assocs. Consulting Eng'rs, P.C.,* 716 F.3d 10, 14 (2d Cir. 2013) (per curiam) (quoting *Lore v. City of Syracuse,* 670 F.3d 127, 157 (2d Cir. 2012)); *see Summa v. Hofstra Univ.*, 708 F.3d 115, 125 (2d Cir. 2013).

The Defendants assert that the Plaintiff cannot establish the fourth element. "That element requires a plaintiff to show a causal connection between the protected activity and the adverse employment action. Such a causal connection can be established indirectly by showing that the protected activity was closely followed in time by the adverse employment action." *Bucalo v. Shelter Island Union Free School Dist.*, 691 F.3d 119, 131 (2d Cir. 2012) (internal citations and quotation marks omitted).

Although the Plaintiff filed his NYSDHR complaint on June 17, 2015, he emailed the Defendants to complain about his treatment as late as November 19, 2015. He was terminated four months later on March 21, 2016. The Second Circuit has held that "five months is not too long to find the causal relationship." *Gorzynski*, 596 F.3d at 110 (citing *Gorman-Bakos v. Cornell Coop. Extension of Schenectady Cty.,* 252 F.3d 545, 555 (2d Cir. 2001)). The law also does not require that the employee file a formal complaint when opposing the discriminatory practices—an informal complaint is sufficient. *See Cruz,* 202 F.3d at 566 ("[T]he law is clear that opposition to a Title VII violation need not rise to the level of a formal complaint in order to receive statutory

protection, this notion of 'opposition' includes activities such as 'making complaints to management . . . and expressing support of co-workers who have filed formal charges.'" (quoting *Sumner v. U.S. Postal Serv.,* 899 F.2d 203, 209 (2d Cir. 1990))); *Ellis v. Century 21 Dep't Stores*, 975 F. Supp. 2d 244, 281 (E.D.N.Y. 2013) ("In order to oppose sexual harassment, [p]laintiff need not have filed a formal complaint as long as she complained of activity that she had a good faith, reasonable belief violated the law."); *Bennett v. Hofstra Univ.,* 842 F. Supp. 2d 489, 500 (E.D.N.Y. 2012) (noting that Title VII does not require a formal complaint); *Martin v. State Univ. of N.Y.,* 704 F. Supp. 2d 202, 227 (E.D.N.Y. 2010) ("It is clearly established that informal complaints to supervisors constitute protected activity under Title VII." (internal citations and quotation marks omitted)).  Therefore, the Plaintiff has sufficiently plead retaliation because his complaints to his superiors were close enough in time to raise an inference of discrimination.  Furthermore, it is noteworthy that the Plaintiff was fired less than three months after the NYSDHR dismissed the Plaintiff's second complaint.

Therefore, the Court finds that the Plaintiff has alleged sufficient facts to withstand the Defendants' motion to dismiss the Plaintiff's retaliation claims pursuant to Title VII, Section 1981 and the NYSHRL against Winthrop, and that portion of the Defendants' motion is denied.

**F.  As to the Plaintiff's Hostile Work Environment Claims Against Winthrop**

The Defendants contend that the Plaintiff's allegations relating to his hostile work environment claim do not rise to the requisite level of severity or pervasiveness, and he has failed to present any non-conclusory allegations that any harassment he faced was because of his race or color.  The Plaintiff argues that under the totality of the circumstances, he faced sufficiently severe and pervasive harassment to sustain his claims against Winthrop.  In the Court's view, the Plaintiff has plead sufficient facts to sustain his hostile work environment claims against Winthrop.

To establish a hostile work environment claim under federal and New York State law, a plaintiff must show that her workplace was "permeated with discriminatory intimidation, ridicule, and insult, that [was] sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993) (quotation marks and citations omitted); *Patterson v. Cty. of Oneida*, 375 F.3d 206, 227 (2d Cir. 2004); *see also Kumaga v. N.Y. City School Constr. Auth.*, 27 Misc.3d 1207(A), 2010 WL 1444513, at *8 (N.Y. Sup. Ct. Apr. 2, 2010) (NYSHRL); *Forrest v. Jewish Guild for Blind*, 3 N.Y.3d 295, 305, 310–11, 786 N.Y.S.2d 382, 819 N.E.2d 998, (N.Y. 2004) (applying the standard for New York state law claim of hostile work environment).

Courts must look at the totality of the circumstances to determine whether an environment is "hostile" or "abusive" and should consider: (1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is physically threatening or humiliating, or a mere offensive utterance; and (4) whether it unreasonably interferes with an employee's "work performance." *Harris,* 510 U.S. at 23.

The Plaintiff must demonstrate that the conduct at issue created an environment that is both objectively and subjectively hostile. *Richardson v. N.Y. State Dep't of Corr. Serv.*, 180 F.3d 426, 436 (2d Cir. 1999); *White v. Fuji Photo Film USA, Inc.,* 434 F. Supp. 2d 144, 154–155 (S.D.N.Y. 2006). Therefore, the Plaintiff must allege not only that he found the environment offensive, but that a reasonable person also would have found the environment to be hostile or abusive. *Harris*, 510 U.S. at 21–22.

Even when a plaintiff establishes that he was exposed to an objectively and subjectively hostile work environment, "[]he will not have a claim . . . unless []he can also demonstrate that the hostile work environment was caused by animus towards [him] as a result of [his] membership in

a protected class." *Sullivan v. Newburgh Enlarged Sch. Dist. Clarence Cooper*, 281 F. Supp. 2d 689, 704 (S.D.N.Y. 2003); *see also Fordham v. Islip Union Free Sch. Dist.*, 662 F. Supp. 2d 261, 273 (E.D.N.Y. 2009) (stating that incidents comprising a hostile work environment claim must occur under circumstances where the "incidents can reasonably be interpreted as having taken place on the basis of that trait or condition").

However, a plaintiff need not prove all of this at the pleading stage. "Specifically, for a 12(b)(6) motion, a 'plaintiff need only plead facts sufficient to support the conclusion that []he was faced with 'harassment . . . of such quality or quantity that a reasonable employee would find the conditions of h[is] employment altered for the worse.'" *Buckley v. N.Y.*, 959 F. Supp. 2d 282, 300 (E.D.N.Y. 2013) (Spatt, J.) (quoting *Patane v. Clark,* 508 F.3d 106, 113 (2d Cir. 2007)). The Plaintiff must still allege that he was subjected to that harassment or hostility because of his membership in that class.

Here, the Plaintiff alleges that over the course of his two year tenure, his supervisors screamed at him in front of patients and staff on several occasions; tore up his medical paperwork in front of patients and staff; cursed at him in front of patients and staff; subjected him to arbitrary discipline; stripped him of his title of chief physician's assistant; and isolated him by preventing him from communicating with his peers.

In isolation, each of these events would be insufficient to allege a cause of action for hostile work environment. However, taken together, and viewed through the lens where the Plaintiff's supervisors allegedly referred to him as a "nigger" to the Plaintiff's co-worker, the events could lead a rational juror to conclude that the Plaintiff was subjected to a hostile work environment because of his race. As the Court stated above, "no single act can more quickly alter the conditions of employment and create an abusive working environment than the use of an unambiguously

racial epithet such as 'nigger' by a supervisor in the presence of subordinates." *Ewing*, 2001 WL 767070, at *7 (quoting *Cruz*, 202 F.3d at 571).

Against that backdrop, even ostensibly race-neutral allegations, such as those listed above, can plausibly be interpreted as contributing to a racially hostile environment. *See Crawford v. AMTRAK*, No. 3:15–cv–131, 2015 WL 8023680, at *6–*7, 2015 U.S. Dist. LEXIS 162608, at *22 (D. Conn. Dec. 4, 2015) (finding that, although some allegedly discriminatory remarks were "on their face race neutral, when evaluated in the context of the alleged ambience at the [plaintiff's place of employment], the comments [were] susceptible of being understood as harassment motivated by racial animus").

At this early stage, the question for the Court is simply whether, taken together, a jury crediting the Plaintiff's allegations could reasonably find pervasive harassment so that his employment was altered for the worse. *See Crawford*, 2015 WL 8023680, at *8–*9, 2015 U.S. Dist. LEXIS 162608, at *28 (quoting *Torres v. Pisano*, 116 F.3d 625, 631 (2d Cir. 1997), *cert. denied*, 522 U.S. 997, 118 S. Ct. 563, 139 L. Ed. 2d 404 (1997)). On the facts and circumstances of this case, the Court answers this question in the affirmative.

As the Second Circuit has explained:

> While the standard for establishing a hostile work environment is high, we have repeatedly cautioned against setting the bar too high, noting that "[w]hile a mild, isolated incident does not make a work environment hostile, the test is whether 'the harassment is of such quality or quantity that a reasonable employee would find the conditions of her employment altered for the worse.'"

*Terry v. Ashcroft,* 336 F.3d 128, 148 (2d Cir. 2003) (quoting *Whidbee v. Garzarelli Food Specialties, Inc.,* 223 F.3d 62, 70 (2d Cir. 2000)); *see also Polito v. Tri–Wire Engineering Solution, Inc.,* 699 F. Supp. 2d 480, 495–96 (E.D.N.Y. 2010). "The environment need not be 'unendurable' or 'intolerable.'" *Terry,* 336 F.3d at 148. Moreover, "the fact that the law requires harassment to

be severe or pervasive before it can be actionable does not mean that employers are free from liability in all but the most egregious cases." *Id.* (quoting *Whidbee,* 223 F.3d at 70 (internal quotation marks omitted)).

Therefore, the Court finds that the Plaintiff has stated enough facts to make it plausible that he was subjected to a racially hostile work environment, in violation of Title VII, Section 1981, and the NYSHRL. Accordingly, the Defendants' motion to dismiss those claims pursuant to Rule 12(b)(6) is denied.

## G. As to the Plaintiff's NYLL Retaliation Claim Against Winthrop

The Defendants similarly argue that the Plaintiff cannot maintain his NYLL retaliation claim against Winthrop because he cannot demonstrate a causal connection between his purported protected activities and any adverse employment action. The Court disagrees.

NYLL § 740, prohibits employers from retaliating against any employee who "discloses, or threatens to disclose to a supervisor or to a public body an activity, policy or practice of the employer that is in violation of law, rule or regulation which violation creates and presents a substantial and specific danger to the public health or safety," N.Y. LAB. LAW § 740(2)(a).

NYLL § 741 prohibits employers from retaliating against an employee who

(a) discloses or threatens to disclose to a supervisor, or to a public body an activity, policy or practice of the employer or agent that the employee, in good faith, reasonably believes constitutes improper quality of patient care; or
(b) objects to, or refuses to participate in any activity, policy or practice of the employer or agent that the employee, in good faith, reasonably believes constitutes improper quality of patient care.

N.Y. LAB. LAW § 741(2).

Both sections of the statute state that an employer may not take adverse employment action against the employee "because" he or she engaged in a protected activity. That is, similar to anti-discrimination laws, the Plaintiff must plausibly allege that there was a causal connection between

29

the adverse personnel action and the protected activity. *Varughese v. Mount Sinai Med. Ctr.*, No. 12 CIV. 8812 CM JCF, 2015 WL 1499618, at *68 (S.D.N.Y. Mar. 27, 2015); *see also Underwood v. Roswell Park Cancer Inst.*, No. 15-CV-684-FPG, 2017 WL 131740, at *19 (W.D.N.Y. Jan. 13, 2017) (finding that the Plaintiff sufficiently alleged a causal connection between his whistleblower activities and his adverse employment action where the Plaintiff complained of hospital procedures as recently as one month earlier), *reconsideration denied*, No. 15-CV-684-FPG, 2017 WL 1593445 (W.D.N.Y. May 2, 2017); *Frederick v. State*, No. 6:16-CV-06570 EAW, 2017 WL 480502, at *7 n.7 (W.D.N.Y. Feb. 3, 2017) (finding that the Plaintiff had sufficiently plead a cause of action under NYLL 740 where one day passed between his complaint and the alleged adverse employment action (citing *Anderson v. State of N.Y., Office of Court Admin. of the Unified Court Sys.*, 614 F. Supp. 2d 404, 430 (S.D.N.Y. 2009) ("Temporal proximity is strong circumstantial evidence of improper intent."))).

Here, the Plaintiff has met his burden because the Plaintiff was suspended less than three months after he complained that Perry had purportedly filled out medical forms with false information. Also, he was stripped of his title of Chief Physician's Assistant less than four months after that complaint. As stated above, courts in this circuit have held that a period of four months is sufficient temporal proximity to plausibly find a causal connection.

Therefore, the Court finds that the Plaintiff has sufficiently plead a cause of action for retaliation under NYLL § 740 and 741 against Winthrop based on the temporal proximity of his complaints to his suspension and the stripping of his title of Chief Physician's Assistant. Accordingly, that portion of the Defendants' motion to dismiss pursuant to Rule 12(b)(6) is denied.

**H. As to the Plaintiff's Section 1981 and NYSHRL Claims Against the Individual Defendants**

The Defendants argue that the Plaintiff's claims against the individual Defendants must be dismissed because the Plaintiff has failed to allege sufficient personal involvement on their part in the Plaintiff's alleged discrimination, retaliation, or hostile work environment.

In order to make out a claim for individual liability under Section 1981, a plaintiff must demonstrate "some affirmative link to causally connect the actor with the discriminatory action." *Whidbee*, 223 F.3d at 75; *Patterson,* 375 F.3d at 229 ("[P]ersonal liability under section 1981 must be predicated on the actor's personal involvement.") (citation omitted). Personal involvement "includes not only direct participation in the alleged violation but also gross negligence in the supervision of subordinates who committed the wrongful acts and failure to take action upon receiving information that constitutional violations are occurring." *Patterson,* 375 F.3d at 229.

The NYSHRL states that it is unlawful discriminatory practice "for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under [the NYSHRL], or attempt to do so." N.Y. Exec. Law § 296(6). "Section 296 imposes liability on an individual employee only if that employee (a) has an ownership interest in the employer, or is the employer; (b) has the power to make, rather than carry out, personnel decisions; or (c) actually participates in the conduct giving rise to the discrimination claim." *Abdi v. Brookhaven Sci. Assocs., LLC*, 447 F. Supp. 2d 221, 228 (E.D.N.Y. 2006) (citing *Hicks v. IBM,* 44 F. Supp. 2d 593, 597 (S.D.N.Y. 1999)).

**1. As to the Discrimination Claims Against the Individual Defendants**

As stated above, the use of alleged racial code words by the Defendants Occhipinti, Gorenstein, and Bieniek may lead to a finding of discriminatory animus on their part. Therefore, the Plaintiff has sufficiently alleged an affirmative link between his discrimination claims and those three individual Defendants. However, there are no facts alleged as to Perry or Hangan that

allow the Court to draw a similar conclusion about them.  The Plaintiff does not allege that either Perry or Hangan have ownership interests in Winthrop, or that they had the power to make personnel decisions.

Therefore, the Defendants' motion to dismiss the Plaintiff's discrimination claims against the individual Defendants pursuant to Rule 12(b)(6) is granted in part, and denied in part.  It is granted to the extent that the discrimination claims against Perry and Hangan are dismissed; and it is denied to the extent that the Plaintiff has alleged sufficient facts against Occhipinti, Gorenstein, and Bieniek for his discrimination claims pursuant to Section 1981 and the NYSHRL to survive scrutiny under Rule 12(b)(6).

### 2.  As to the Retaliation Claims Against the Individual Defendants

The Plaintiff did not allege any facts that connect the individual Defendants, in any meaningful way, to the Plaintiff's retaliation claim.   None of the individual Defendants is affirmatively linked with the decision to terminate the Plaintiff.   Accordingly, the Defendants' motion to dismiss the Plaintiff's Section 1981 and NYSHRL retaliation claims pursuant to Rule 12(b)(6) is granted.

### 3.  As to the Hostile Work Environment Claims Against the Individual Defendants

As with his discrimination claims, the Plaintiff has not alleged any facts to support his claim that Perry or Hangan's actions towards him were motivated by racial animus.  *See Paul v. Postgraduate Ctr. for Mental Health*, 97 F. Supp. 3d 141, 168 (E.D.N.Y. 2015) (recognizing it as "important in hostile work environment cases to exclude from considerations [acts taken against the plaintiff] that lack a linkage or correlation to the claimed ground of discrimination"); *Wesley–Dickson v. Warwick Valley Cent. Sch. Dist.*, 973 F. Supp. 2d 386, 406 (S.D.N.Y. 2013)  (finding that "various items that made [the plaintiff's] life unpleasant" did not contribute to a racially hostile

work environment because there was "nothing linking those items to racial hostility"). However, the Plaintiff has alleged that Occhipinti, Gorenstein, and Bieniek contributed to the hostile work environment and that they used code words to convey their racial animus.

Accordingly, the Defendants' motion to dismiss the Plaintiff's hostile work environment claims pursuant to Rule 12(b)(6) is granted in part, and denied in part. It is granted to the extent that the hostile work environment claims against Perry and Hangan are dismissed; and it is denied to the extent that the hostile work environment claims against Occhipinti, Gorenstein, and Bieniek survive Rule 12(b)(6) scrutiny.

## III. CONCLUSION

For the reasons stated above, the Defendants' motion to dismiss the Plaintiff's complaint pursuant to Rule 12(b)(6) is granted in part, and denied in part. It is granted to the extent that the following claims are dismissed: all claims against Hangan and Perry; and the retaliation claims pursuant to Section 1981 and the NYSHRL against the individual Defendants. It is denied to the extent that the following causes of action plausibly state a claim upon which relief can be granted: the discrimination, retaliation, and hostile work environment claims pursuant to Section 1981, Title VII, and the NYSHRL against Winthrop; the NYLL retaliation claims against Winthrop; and the discrimination and hostile work environment claims pursuant to Section 1981 and the NYSHRL against Occhipinti, Gorenstein, and Bieniek.

This case is respectfully referred to Magistrate Judge Arlene R. Lindsay for the remainder of discovery. The Clerk of the Court is directed to terminate Hangan and Perry as defendants in this action, and to amend the official caption to reflect the following:

----------------------------------------------------------------x

THOMAS WOODING,

                        Plaintiff,

      -against-

WINTHROP UNIVERSITY HOSPITAL, SCOTT
GORENSTEIN *in his individual and official
capacity,* CHARLES OCCHIPINTI *in his
individual and official capacity,* FRANCESCA
BIENIEK *in her individual and official capacity,*

                      Defendants.

----------------------------------------------------------------x


       It is **SO ORDERED:**

Dated: Central Islip, New York

      June 12, 2017

                                 _____*/s/ Arthur D. Spatt*_____

                                     ARTHUR D. SPATT

                            United States District Judge